_____ Priority
_____ Send
_____ Clsd
_____ Enter
_____ JS-5/JS-6
_____ JS-2/JS-3

FILED
CLERK, U S  DISTRICT COURT

APR – 7 2004

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELECTRO SOURCE, LLC, a California limited liability company, | CASE NO. CV 02-7974 NM (CTx) |
| Plaintiff, | |
| v. | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| PELICAN PRODUCTS, INC., a California corporation, BRANDESS-KALT-AETNA GROUP, INC., an Illinois corporation, | |
| Defendants. | |

ENTERED
CLERK, U.S. DISTRICT COURT

APR – 8 2004

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

## I. INTRODUCTION

Electro Source, LLC ("Plaintiff" or "Electro Source") brings this suit alleging that Defendants Pelican Products, Inc. ("Pelican") and Brandess-Kalt-Aetna Group, Inc. ("Brandess") (collectively "Defendants") have infringed its Pelican logo mark, Trademark Registration No. 2,073,287 ("'287 Registration"), which Plaintiff acquired on or about August 5, 2002 from registrant Ron Mallett. This is the second suit between the parties concerning infringement of their respective registrations. Defendants now move for summary judgment on the basis that the '287 Registration is invalid and unenforceable because the

DOCKETED ON CM

APR – 8 2004

BY

004

1  application was fraudulently procured and renewed by knowingly false

2  declarations, the mark was subsequently abandoned, and the assignment to Electro

3  Source was an assignment in gross.  Defendants request an order cancelling the

4  '287 Registration and summary judgment dismissing Plaintiff's remaining claims

5  in their entirety.

6

7  ## II. FACTS

8  In 1995, Ron Mallett began selling goods under a logo consisting of an

9  outline of a flying pelican in a circle with the word "pelican" written below.

10  Mallett Depo., pp. 23-24 (Finch Decl., Exh. A).  The pelican logo was primarily

11  designed by Mallett's friend Tom Robbins.  Id.; Mallett Decl. ¶ 3.  Robbins, who

12  lived in Thailand and had access to manufacturing facilities, agreed to

13  manufacture products with the Pelican logo while Mallett agreed to design,

14  market, and sell the goods in the United States.  Mallett Depo., pp. 23-24, 39-40;

15  Mallett Decl. ¶¶ 2-3.  Robbins created samples of backpacks, totebags, wallets,

16  and luggage pieces bearing the Pelican logo to show to potential buyers.  Mallett

17  Decl. ¶¶ 3, 5; Mallett Depo., p. 40.

18  On August 14, 1995, Ron Mallett and his wife, Jeffri Ann Mallett, filed a

19  Fictitious Business Name Statement for use of the name "Pelican."  Finch Decl.,

20  Exh. C; Mallett Depo., pp. 348-49.  The Malletts represented that they had not yet

21  begun to transact business under the fictitious business name.  Finch Decl., Exh.

22  C.  On November 20, 1995, Mallett filed an application for registration of the

23  Pelican logo with the Patent and Trademark Office ("PTO").  Finch Decl., Exh. I.

24  Mallett filed as an individual and represented that (1) the Pelican logo was being

25  used on wallets, backpacks, totebags, luggage, hats, tee-shirts, shorts, and shirts,

26  and (2) that the first use of the trademark and its first use in interstate commerce

27  were June 1, 1995.  Id., p. 186.  Mallett signed the application under penalty of

28  perjury.  Id., p. 187.

By letter dated May 23, 1996, the PTO refused Mallett's application insofar as it extended to hats, tee-shirts, shorts, and shirts, on the basis of a likelihood of confusion with existing registrations. Id., pp. 176-80. Mallett responded in a letter dated June 25, 1996, by amending his application to delete those goods, as suggested by the PTO. Id., p. 175. On June 24, 1997, the PTO issued Trademark Registration No. 2,073,287 to Mallett for wallets, backpacks, totebags, and luggage with a first use and first use in commerce date of June 1, 1995. Id., p. 172.

Mallett transported and sold Pelican-branded goods from 1995 through 2001. Sales Chart, Finch Decl., Exh. X. There were approximately 200 recorded sales in 1996, 104 sales in 1997, 52 sales in 1998, 23 sales in 1999, 11 sales in 2000, and 5 sales in 2001. Id. Mallett's last recorded sale in interstate commerce was on November 17, 1998, when he sold wallets to a company in Texas. Sales . Chart, Finch Decl., Exh. X, lines 358-59. In the years 2000, 2001, and 2002, Mallett stated that he often sold Pelican-branded products for cash and did not keep records of these transactions. Mallett Decl. ¶ 15. The last time Mallett purchased goods·from Robbins was in 1996. Mallett Depo., p. 27. As of February 2003, Mallett had no intention of ordering any more inventory. Id., pp. 244-45.

Mallett employed sales representatives to sell his Pelican-branded products in 1996 and 1997 but not thereafter. Id., pp. 154-55. In 1998, business slowed down when Mallett suffered a serious illness requiring four surgeries. Id., pp. 27-28. On February 2, 1998, Mallett gave away to Robbins 31 boxes containing $16,000 in Pelican-branded inventory he had stored in his garage. Id., pp. 16, 185-87; "Pelican Inventory to Tom," Finch Decl., Exh. J. Mallett stated that he "was trying to get [the inventory] down." Mallett Depo., p. 187. Mallett had no business dealings with Robbins after that date. Id., pp. 405, 407.

By late 1998, Mallett was selling his remaining inventory below wholesale prices and sometimes below cost in order to get rid of his inventory. (Compare

3

1  wholesale prices in Finch Decl., Exh. B, p. RM 0195 and advertised wholesale
2  prices in "Pelican Catalogs Masters," Finch Decl., Exh. N, with Invoices, Finch
3  Decl., Exh. M, pp. RM 0141-42, RM 0145-0158 and Sales Chart, Finch Decl.,
4  Exh. X); Mallett Depo, pp. 325, 327, 329.  The last use of Pelican letterhead, as
5  reflected in the record, was December 1, 1998.[1]  Invoice, Finch Decl., Exh. O.
6  Although Mallett filed a Schedule C with his tax returns for the Pelican business
7  in 1996 and 1997, he did not do so thereafter.  Mallett Decl. (Finch Decl., Exh. P);
8  Mallett Depo., p. 328.

9      In 1998 and thereafter, Mallett began selling products as a commissioned
10  salesman for No Fear and Billabong and then for Koko Island, World Famous
11  Sports, and Blue Gem.  Mallett Depo., pp. 27-33.  On January 1, 1999, Mallett
12  entered into an "Operating Agreement for Koko Island LLC," which included a
13  non-compete clause.  Finch Decl., Exh. K, § 5.5.  While Mallett was selling Koko
14  Island products, he also attempted to dispose of his remaining inventory of
15  Pelican-branded goods below wholesale prices.  Mallett Depo., p. 153.  In 1998,
16  Mallett, in fact, attempted to sell his Pelican-branded goods to Pelican, a
17  Defendant in this case.  Id., p. 257.  Mallett was not concerned about confusing the
18  origin of the mark or possible infringement by Pelican.  Id., pp. 83-84.

19      Sometime before August 5, 2002, Plaintiff Electro Source indicated its
20  desire to acquire the Pelican logo mark and the '287 Registration.  Id., pp. 77-78,
21  352-53.  On August 5, 2002, Mallett assigned the '287 Registration to Plaintiff for
22  $15,000.  Assignment and License of Trademark, p. RM 0026-28 (Finch Decl.,
23  Exh. S).  The assignment included a license-back agreement, permitting Mallett to
24  continue selling Pelican-branded goods.  Id., p. RM 0026.  Also on that date, an
25  "Assignment of Trademark" was filed with the PTO.  Finch Decl., Exh. T, pp. ES

26

27      [1] Excluding Mallett's inventory sale to Plaintiff in December 2002.  See discussion
28  infra, p. 5.

4

1   5280-81. Plaintiff's assignment was effectuated during the pendency of the first
2   case between the parties before this court, in which Electro Source alleged that
3   Pelican's use of the "Pelican" word and design marks infringed upon Electro
4   Source's registered marks. See Electro Source, LLC v. Pelican Products, Inc., CV
5   No. 01-1555, Filed 2/15/01 ("Pelican I").[2]

6       On September 17, 2002, Plaintiff filed a Combined Declaration of Use and
7   Incontestability Under §§ 8 & 15 of Title 15. Finch Decl., Exh. T, pp. 301-06.
8   Michael Placido, President of Electro Source, represented that (1) the mark had
9   been in continuous use in commerce for five consecutive years after the date of
10  registration, and (2) the owner was using or was using through a related company
11  the mark in commerce on or in connection with the goods listed in the registration.
12  Id., pp. 301-02. Placido signed the declaration under penalty of perjury. Id.,
13  p. 302; Placido Depo., pp. 60-63 (Finch Decl., Exh. Q).

14      Mallett approached Electro Source with an offer to buy his remaining
15  inventory. Mallett Depo., pp. 256-57. On December 2, 2002, after the initiation
16  of this suit, Plaintiff purchased Mallett's remaining Pelican inventory for
17  $5,053.25, approximately the wholesale value of the goods. Id., pp. 244-45;
18  Placido Depo., pp. 24-25; Invoice to Larry Russ, Finch Decl., Exh. R. Plaintiff
19  has not used Mallett's trademark since the assignment. Placido Depo., pp. 53-54.

20

21                           III. **LEGAL STANDARD**

22      Summary judgment is appropriate when "the pleadings, depositions,
23  answers to interrogatories, and admissions on file, together with the affidavits, if
24  any, show that there is no genuine issue as to any material fact and that the moving

25  ───────────────

26      [2] Pelican I remains pending. On August 22, 2001, this court granted in part
27  Pelican's motion for a preliminary injunction on its counterclaim of trademark
    infringement, and on May 20, 2002 found Electro Source in contempt for violating the
28  court's order.

party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Celotex Corporation v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

In a trio of 1986 cases, the Supreme Court clarified the applicable standards for summary judgment.  See id.; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita Electrical Industry Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  See Anderson, 477 U.S. at 256.  The governing substantive law dictates whether a fact is material; if the fact may affect the outcome, it is material.  See id. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.")  If the moving party seeks summary adjudication with respect to a claim or defense upon which it bears the burden of proof at trial, it must satisfy its burden with affirmative, admissible evidence.  Id. at 257.  By contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence submitted by the non-moving party.  See Celotex, 477 U.S. at 325.  The moving party need not disprove the other party's case.

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  When assessing whether the non-moving party has raised a genuine issue, the court must believe the evidence and draw all justifiable inferences in the non-movant's favor.  Anderson, 477 U.S. at 255 (citing Adickes v. S.H. Kress and Co., 398 U.S. 144, 158-59 (1970)).  Nonetheless, "the mere existence of a scintilla

of evidence" is insufficient to create a genuine issue of material fact. <u>Id.</u> at 252.

As the Supreme Court explained in <u>Matsushita</u>,

> [w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

475 U.S. at 586-87 (citations omitted).

To be admissible for purposes of summary judgment, declarations or affidavits must be based on personal knowledge, must set forth "such facts as would be admissible in evidence," and must show that the declarant or affiant is competent to testify concerning the facts at issue. Fed. R. Civ. P. 56(e). Declarations on information and belief are insufficient to establish a factual dispute for purposes of summary judgment. <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989).

## IV. ANALYSIS

Defendants argue that the '287 Registration is invalid and unenforceable because (1) the original applicant, Ron Mallett, falsely claimed actual use in commerce on goods in connection with which the mark had never been used; (2) Mallett falsely claimed that he owned the mark when the mark was owned by a joint venture of three individuals consisting of the Malletts and Robbins; (3) the president of Electro Source, the assignee, falsely swore in an affidavit filed with the PTO under 15 U.S.C. §§ 8 and 15 that its newly acquired mark had been continuously used in commerce on each of the goods listed in the registration for the preceding five years when, in fact, the last sale in commerce of goods bearing the mark occurred on November 17, 1998; (4) the mark was abandoned on or about February 2, 1998 when the parties to the joint venture divided the remaining

7

1   inventory and ceased doing business under the Pelican name or logo without

2   disposing of the mark or goodwill; and (5) the mark was invalidated by the

3   attempted assignment of the '287 Registration four years later without the

4   assignment of any goodwill, thereby constituting an assignment in gross.

5

6   **A.   Defendants cannot demonstrate as a matter of law that Mallett filed a
      false application for registration**

7       On November 20, 1995, Mallett filed an application for registration of the

8   Pelican logo, which later became the '287 Registration.  Finch Decl., Exh. I.  The

9   goods claimed in the application included "wallets, backpacks, totebags, luggage,

10  hats, tee shirts, shorts [and] shirts."  Id., p. 186.  Mallett claimed first use and first

11  use in commerce as of June 1, 1995.

12      Defendants argue that the application is false because neither (1) Mallett nor

13  anyone else used the trademark on or before June 1, 1995 on any goods; (2) on

14  tee-shirts, shorts, or shirts at any time; or (3) on backpacks, totebags, luggage or

15  hats before filing the application on November 20, 1995.  Defendants also argue

16  that Mallett falsely claimed individual ownership when, in fact, the mark was

17  owned by a joint venture between Mallett, his wife, and Robbins.[3]  Defendants

18  maintain that these falsities warrant cancellation of the registration.

19      In any action involving a registered mark, the court may determine the right

20  to registration.  Dymo Industries, Inc. v. Tapeprinter, Inc., 326 F.2d 141, 143 (9th

21

22

23

24
    _____

25      [3] Plaintiff's citation to Berclain America Latina, S.A. de C.V. v. Baan Co. N.V., 74
    Cal. App. 4th 401, 405 (1999) for the proposition that Defendants lack standing to

26  challenge the agreement between Mallett and Robbins is misplaced.  Defendants are not
    non-parties seeking rights under a contract.  Rather, they are challenging Mallett's

27  characterization of his relationship with Robbins to show that Mallett filed a false

28  application for registration.

1  Cir. 1964); 15 U.S.C. § 1119.[4]  A party may seek cancellation of a registered
2  trademark on the basis of fraud. <u>Robi v. Five Platters, Inc.</u>, 918 F.2d 1439, 1444
3  (9th Cir. 1990); 15 U.S.C. § 1064(c).  To demonstrate fraud in procuring a
4  trademark registration or renewal, a party must prove (1) a false representation of
5  a material fact; (2) the registrant's knowledge or belief that the representation is
6  false; (3) the intent to induce reliance upon the misrepresentation and reasonable
7  reliance thereon; and (4) damages proximately resulting from the reliance. <u>Robi</u>,
8  918 F.2d at 1444; <u>see also</u> <u>Torres v. Torresella</u>, 808 F.2d 46, 48 (Fed. Cir. 1986).
9  Fraud will not be found where there is an honest misunderstanding, honest belief
10  in the truth of the statement, inadvertence, or negligent omission.  <u>First Int'l</u>
11  <u>Services Corp. v. Chuckles Inc.</u>, 5 U.S.P.Q.2d 1628, 1634 (T.T.A.B. 1988)
12  (citation omitted).

13      "[I]t is difficult, if not impossible, to prove what occurs in a person's mind,
14  and that intent must often be inferred from the circumstances and related
15  statement[s] made by that person.  Otherwise, all claims of fraud could easily be
16  defeated by the simple statement, 'I had no intent to do so.'"  <u>Id.</u> at 1636.  "[T]he
17  very nature of the charge of fraud requires that it be proven 'to the hilt' with clear
18  and convincing evidence.  There is no room for speculation, inference or surmise
19  and, obviously, any doubt must be resolved against the charging party."  <u>Id.</u> at
20  1634 (citation omitted); <u>see also</u> <u>Beer Nuts v. Clover Club Foods Co.</u>, 711 F.2d
21  934, 942 (10th Cir. 1983); <u>Robi</u>, 918 F.2d at 1444 (citing approvingly to <u>Beer</u>
22  <u>Nuts</u>).

23

24  ─────────────────

25      [4] 15 U.S.C. § 1119 provides, "In any action involving a registered mark the court
    may determine the right to registration, order the cancelation of registrations, in whole or
26  in part, restore canceled registrations, and otherwise rectify the register with respect to the
    registrations of any party to the action. Decrees and orders shall be certified by the court
27  to the Director, who shall make appropriate entry upon the records of the Patent and
28  Trademark Office, and shall be controlled thereby."

9

**1.     Use in commerce**

A trademark need not be used on a nationwide basis in order to qualify for federal registration; use in interstate commerce is sufficient.  <u>Car Subx Service Systems, Inc. v. Exxon Corp.</u>, 215 U.S.P.Q. 345, 350 (T.T.A.B. 1982).  Under 15 U.S.C. § 1127, "use in commerce" is defined as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark."  The use of the term "bona fide" eliminates token use as a basis for registration and contemplates commercial use of the type common to the particular industry in question.  <u>Chance v. Pac-Tel Teletrac Inc.</u>, 242 F.3d 1151, 1156-57 (9th Cir. 2001).

Specifically, a mark is deemed to be used in commerce when (1) the mark has been placed on the goods or their containers, labels or the documents associated with the goods or their sale and (2) the goods are "sold or transported in commerce."  15 U.S.C. § 1127; <u>Karl Storz Endoscopy-America, Inc. v. Surgical Technologies, Inc.</u>, 285 F.3d 848, 855 (9th Cir. 2002); <u>Person's Co., Ltd. v. Christman</u>, 900 F.2d 1565, 1568 (Fed. Cir. 1990).  As Defendants concede,"[t]he 'or transported' language of 15 U.S.C. § 1127 makes it clear that a 'use in commerce' under the Lanham Act is not limited to sales."  <u>Karl Storz</u>, 285 F.3d at 855; <u>Societe De Developments Et D'Innovations Des Marches Agricoles Et Alimentaires-Sodima-Union De Cooperatives Agricoles v. Int'l Yogurt Co., Inc.</u>, 662 F. Supp. 839, 853 (D. Or. 1987) ("Shipments to various states without actual sale[s] can be sufficient use in commerce."); <u>see also</u> Defs.' Reply, p. 5.

**i.     Wallets, backpacks, totebags, and luggage**

In opposition to Defendants' motion for summary judgment, Plaintiff submitted a declaration from Mallett, asserting that as of at least June 1, 1995, he sent samples bearing the Pelican trademark on wallets and luggage in the form of backpacks, totebags, and briefcases from California to his sales representatives in

1    Florida and Virginia in order to obtain orders for these products. Mallett Decl.

2    ¶ 7. Though no sales may have resulted from these shipments, it cannot be said

3    that the transportation of these samples did not constitute "use in commerce." <u>See</u>

4    <u>Karl Storz</u>, 285 F.3d at 855 ("The sending of a product from Los Angeles to New

5    York with its label attached so that its trademark could be registered has been

6    considered transportation in commerce."); <u>Societe De Developments</u>, 662 F. Supp.

7    at 853.

8        Defendants argue, however, that apart from Mallett's declaration submitted

9    in response to Defendants' motion, there is no evidence of any transportation of

10   backpacks, totebags, or luggage before 1996, and that if such evidence did exist, it

11   was conveniently destroyed.[5] Defendants also note that Plaintiff has presented no

12   evidence from any out-of-state customers to whom Mallett allegedly sent samples.

13   Defendants request that Mallett's declaration be stricken because Mallett

14   destroyed material evidence and Plaintiff failed to preserve it.[6]

15       Sanctions may be imposed against a litigant who, once on notice that

16   documents and information in its possession are relevant to litigation or potential

17   litigation or are reasonably calculated to lead to the discovery of admissible

18   evidence, nonetheless destroys such documents and information. <u>WM. T.</u>

19   <u>Thompson Co. v. General Nutrition Corp., Inc.</u>, 593 F. Supp. 1443, 1455 (C.D.

20   Cal. 1984). The court may exclude the introduction of evidence, create a

21   rebuttable presumption against the responsible party that the evidence, if it had not

22   been despoiled, would have been detrimental to that party, or even allow default or

23   _____

24       [5] The records do indicate, however, that there were wallet sales as early as

25   September 11, 1995. Sales Chart, Finch Decl., Exh. X.

26       [6] Plaintiff objects to the court's consideration of the destruction of documents on

27   the basis that Defendants could have raised this issue in their moving papers. On a
     motion for summary judgment, however, Defendants need only point out the absence of

28   evidence. <u>See Anderson</u>, 477 U.S. at 256.

1   dismissal. Id. at 1456; BTO Logging, Inc. v. Deere & Co., 174 F.R.D. 690, 692-

2   93 (D. Or. 1997); Unigard Security Ins. v. Lakewood Engineering &

3   Manufacturing Corp., 982 F.2d 363, 368-69 (9th Cir. 1992).

4        Mallett admits that in the summer of 2002 and not long after assigning the

5   trademark to Electro Source, he cleaned out some old records and may have

6   thrown out records relating to Pelican trademark sales. Mallett Decl. ¶ 12; Mallett

7   Depo., pp. 221-22, 266.[7] He discarded a number of boxes of old records that may

8   have contained information about sales bearing the Pelican mark. Id. In

9   particular, he believes 1995 sales records may have been discarded. Id., p. 221.

10  The records were discarded after the filing of the Pelican I lawsuit on February 15,

11  2001 but before the filing of the instant lawsuit on October 15, 2002. Mallett

12  states that he did not discuss his actions with Electro Source or its attorneys before

13  doing so. Id., pp. 221-22. Mallett did, however, after speaking with Plaintiff's

14  attorneys, throw out pictures from some trade shows where he allegedly sold

15  Pelican-branded products because he "[d]idn't think [he] would need them." Id.,

16  p. 222.

17       The timing and explanation for discarding any documentation of sales that

18  may have occurred prior to 1996 is suspect.[8] Nonetheless, the court cannot find on

19  _____

20       [7] Q: And prior to '96 you didn't have invoices?

21       A: No, I had invoices, but as I've stated before, all my records prior to '96 are
    gone.

22       Q: You destroyed those or got rid of them?

23       A: Yes.
         Q: Why did you do that?

24       A: I didn't need them anymore. I was cleaning house.
         Q: Why were you cleaning house?

25       A: I didn't like a messy office.

26  Mallett Depo., p. 266.

27       [8] It is also curious that Plaintiff has not submitted declarations from representatives

28  to whom Mallett allegedly sent samples.

the record before it that the destruction of records was purposeful. First, Mallett is

not a litigant in this suit. It is not clear how the destruction would have benefitted

Mallett or whether there was an improper motive for doing so. Second, there is no

evidence in the record that Mallett was aware of the pending Pelican I lawsuit or

the circumstances that led to the filing of the instant lawsuit. Nor is there any

evidence that Mallett was directed to retain or discard any documents. Moreover,

insofar as a determination requires examining the credibility of Mallett, the

question is not properly resolved on a summary judgment motion.[9]  See State Farm

Mut. Auto. Ins. Co. v. Khoe, 884 F.2d 401, 404-05 (9th Cir. 1989) (district court is

not "permitted to weigh the evidence put forth by the parties or to evaluate the

credibility of witnesses" on a motion for summary judgment) (citation omitted).

The court therefore declines to strike Mallett's declaration.[10]


### ii.    "Luggage"

Defendants take issue with Plaintiff's registration of luggage, arguing that

Plaintiff never used "luggage" in commerce. Plaintiff retorts that totebags and

backpacks qualify as "luggage." Mallett testified that he was advised by an

examining attorney at the PTO that the goods he was selling were considered

luggage and that he should include luggage as goods listed in the registration.

---

[9] Defendants cite Unigard Security Ins., 982 F.2d 363 and BTO, 174 F.R.D. 690 in requesting that the court infer that the destroyed evidence would have verified falsity in Mallett's registration. These cases are distinguishable on the basis that both involved parties to the litigation who discarded evidence despite being aware of the possibility of litigation to which the evidence might have been relevant.

[10] Defendants also allege that Mallett's declaration is a sham. See Kennedy v. Allied Mutual Ins. Co., 952 F.2d 262 (9th Cir. 1991). The court does not find that Mallett made contradictory statements between his declaration and deposition testimony justifying such conclusion.

1  Mallett Decl. ¶ 8.[11]  Assuming, arguendo, that totebags and backbacks do not

2  qualify as "luggage," Defendants fail to show that Mallett knowingly made a false

3  representation of a material fact.[12]  The evidence in the record shows, if anything,

4  that Mallett was not experienced in the area of trademark registration.[13]  It does

5  not, however, demonstrate fraud as a matter of law.

6

7           **iii.   Hats, tee-shirts, shorts, and shirts**

8           Although Mallett originally included hats, tee-shirts, shorts, and shirts in his

9  application, the PTO objected to the inclusion of these goods on the basis of a

10  likelihood of confusion with other registered trademarks.  Finch Decl., Exh. I,

11  pp. 176-180.  Plaintiff amended his application to delete these references and the

12  application was allowed.  Id., p. 175; Mallett Decl. ¶ 9.  Defendants argue that

13  _____

14  [11] Defendants object to this testimony on the basis of hearsay.  The PTO attorney's

15  statement is not hearsay because it is not offered not for the truth of the matter asserted,
    but to show Mallett's state of mind.

16

17  [12] Defendants also argue that Mallett's assertion contradicts the PTO record of
    events contained in its response to Mallett's application.  See Finch Decl., Exh. I, pp.

18  178-80.  The PTO response did not state that luggage was improperly included on

19  Mallett's application.  In any case, the PTO's written response does not preclude the
    alleged conversation.

20

21  [13] Mallett testified:
         A: As I recall, I turned it in and made the application as you saw here, the regular

22  application.  They turned me down.  They said it was too broad.  I talked to the guy there,
    who I assumed and I think he was an attorney.  He was [a] patent attorney or something,

23  some junior guy they hired.  He didn't make much money.  He was getting started and that

24  kind of stuff.  He said your class is too broad, and they narrowed it down to wallets,
    backpacks, totebags and luggage.  He said you need to be in that category, and those are

25  all one category, as I remember.  So I resubmitted it, and they said fine, that's it.

26       Q: Excuse me.
         A: That was basically it.  I remember talking to him, and he was helping me out

27  because I was a layman.  I didn't know anything about this stuff.

28  Mallett Depo., p. 391 (Mallet Decl., Exh. 5).

14

1   "[a]lthough [these] goods . . . were later deleted from the application, Mallett's

2   Declaration was false when he signed it because he claimed use on these goods

3   when he had never used it on any goods but, perhaps, wallets." Defs.' Mot., p. 19.

4   In response, Mallett stated that he believed he sent out samples of these goods

5   bearing the trademark to sales representatives in Florida and Virginia, but due to

6   the passage of time, he was not as clear on the clothing items as he was with

7   respect to the wallets and luggage.  Mallett Decl. ¶¶ 8-9; Mallet Depo., p. 303.[14]

8   He also noted that he dropped the clothing items early on, as there was little

9   interest in them during his marketing efforts.  Id.  In light of Mallett's testimony,

10  Defendants cannot show that Mallett knowingly made a false representation of

11  material fact.

12          To demonstrate fraud in procuring a trademark registration or renewal, the

13  party alleging fraud bears the heavy burden of showing that an applicant

14  knowingly made false, material representations of fact in his application in order

15  to deceive the PTO.  Torres, 808 F.2d at 49; First Int'l, 5 U.S.P.Q.2d at 1634

16  ("[Fraud] involves a willful withholding from the Patent and Trademark Office by

17  an applicant or registrant of material information or fact which, if disclosed to the

18  Office, would have resulted in the disallowance of the registration sought or to be

19  maintained."); Brookfield Communications, Inc. v. West Coast Entertainment

20  Corp., 1999 U.S. Dist. LEXIS 23251, * 11 (C.D. Cal. 1999) ("[A] material

21

22          [14] Q: So you didn't sell slacks, shorts, swimming trunks, shirts, T-shirts, none of
        that stuff? You didn't sell any of that with the Pelican logo?

23          A: We had the Pelican logo on some shorts that we showed, but we didn't sell

24  them to any big accounts.

25          Q: You said you didn't sell them to any big accounts.  Did you sell them to any
        accounts at all?

26          A: No, we made up samples and showed it, but –

27          Q: No sales?
        A: Yeah.

28  Id., p. 303.

1 misrepresentation arises only if the registration should not have issued if the truth

2 were known to the examiner.") (citation omitted); 5 J. Thomas McCarthy,

3 McCarthy on Trademarks and Unfair Competition ("McCarthy") § 31:66 (4th ed.)

4 ("Fraud requires proof of a knowingly false statement [that] was made with an

5 intent to deceive the PTO.").

6     The test for materiality is whether "but for the misrepresentation, the federal

7 registration either would not or should not have issued." McCarthy § 31:67;

8 Brookfield, 1999 U.S. Dist. LEXIS 23251, * 11. Because the questionable goods

9 were deleted from the application before the trademark was registered, any alleged

10 misrepresentation is immaterial. The deletion of these goods ultimately permitted

11 its registration. Given these circumstances, the PTO could not have been

12 deceived.

13

14 **2.    Joint venture**

15     Under California law, a joint venture is created where there is an agreement

16 between the parties under which they have a community of interest or joint interest

17 in a common business undertaking, an understanding as to the sharing of the

18 profits and losses, and the right of joint control. Bank of California v. Connolly,

19 36 Cal. App. 3d 350, 364 (1973). Mallett has described his relationship with

20 Robbins as a "very loose 'handshake' arrangement" or "loose partnership."

21 Mallett Decl. ¶ 4; Mallett Depo., p. 351. According to Mallett, the terms of his

22 oral agreement with Robbins included:

23     (a) Robbins agreed to manufacture the items overseas and send Mallett an

24 agreed quantity in California. If Mallett deemed the goods acceptable, he would

25 sell them in the United States;

26     (b) Robbins made alterations to the trademark, as requested by Mallett;

27 Robbins used the mark overseas and Mallett was the owner of the modified mark

28 in the United States. Mallett's ownership of the trademark was independent of his

1    relationship with Robbins and would continue after the relationship ended;

2          (c) Robbins would not use the mark in the United States;

3          (d) They would split the proceeds on products sold in the United States; and

4          (e) Robbins had no control or say with respect to the marketing, sales,

5    management or any of the business operations in connection with the sale of the

6    goods containing the '287 mark.  Mallett had the right to reject goods if they did

7    not properly present his trademark or if their quality was not up to his standards.

8    Mallett Decl. ¶ 4.

9          Regardless of whether there was a joint venture between Mallett and

10   Robbins, the undisputed evidence is that Mallett was the sole owner of the

11   trademark.  Id.[15]  Defendants argue that Mallett was not the owner of the '287

12   mark because as between manufacturers and distributors of a product, the

13   manufacturer is presumed to own the trademark.  See Sengoku Works Ltd. v.

14   RMC International, Ltd., 90 F.3d 1217, 1220 (9th Cir. 1996).  Defendants

15   concede, as they must, that although this is generally true, the parties may enter an

16   agreement to the contrary.  See id.

17         Here, the only evidence before the court is that Mallett owned the trademark

18   rights.  There is no other evidence in the record stating or suggesting that Robbins

19   owned the trademark.[16]  Further, there is no evidence that Robbins ever used the

20

21         [15] Although Defendants claim that Mallett's wife was a member of the joint

22   venture, they offer no evidence to support this claim, other than the fact that she signed

23   the Fictitious Business Name Statement in August 1995.

24         [16] Defendants argue that "there is no evidence of such an agreement and because

25   Mr. Mallett destroyed the documents, corroboration of such an agreement is impossible."
     Defs.' Reply, pp. 6 n. 5.  As a result, they argue, the non-existence of such an agreement

26   must be inferred.  Mallett testified, however, that there was no written agreement with

27   Robbins; therefore the destruction of documentation is irrelevant.  See Mallett Decl. ¶ 4
     (describing agreement with Robbins as "a very loose 'handshake' arrangement."), Mallett

28   Depo., p. 189 (Q: You had no written agreement as to a business arrangement between –

1    mark in the United States.  See Person's, 900 F.2d at 1568 ("use in commerce"

2    refers to a sale or transportation of goods bearing the mark in or having an effect

3    on United States interstate commerce, United States commerce with foreign

4    nations, or United States commerce with the Indian tribes); McCarthy § 17:9 ("For

5    purposes of trademark rights in the United States, 'use' means use in the United

6    States, not use in other nations.").  Accordingly, Defendants cannot demonstrate

7    that Mallett falsely claimed sole ownership in his trademark application.

8

9    **B.    Defendants cannot demonstrate as a matter of law that Plaintiff filed a**
     **false Combined Declaration of Use and Incontestability Under §§ 8 &**
10   **15**

11         On September 17, 2002, Michael Placido, president of Electro Source, filed

12   a Combined Declaration of Use and Incontestability Under §§ 8 & 15.  Defendants

13   argue that the Combined Declaration filed by Plaintiff contained three false

14   statements: (1) that Plaintiff was using the mark in commerce on wallets,

15   backpacks, totebags, and luggage; (2) that the mark had been in continuous use in

16   commerce for five consecutive years after the date of registration; and (3) that the

17   mark was still being used in commerce on all goods listed in the existing

18   registration.  It is Defendants' belief that the allegedly false declaration was filed

19   in order to (1) avoid cancellation of the '287 Registration so that it could be used

20   as leverage against Pelican in the pending Pelican I case and to (2) gain

21   incontestability status for the '287 mark in order to eliminate the defenses that

22   Pelican could assert and hence to complicate Pelican's ability to defend itself.

23         Under 15 U.S.C. § 1065, a registrant's right to use a registered mark is

24   deemed incontestable for the goods named if the mark has been in continuous use

25   for five consecutive years subsequent to the date of registration and is still in use.

26

27   ―――――――――――

28   A. No. Q: – you and Mr. Robbins? A. No.); p. 286 (describing relationship with Robbins
     as "loose verbal agreement").

18

1  The registrant gains a "new right with respect to the goods specifically recited in
2  the affidavit." Duffy-Mott Co. v. Cumberland Packing Co., 424 F.2d 1095, 1100
3  (C.C.P.A. 1970). Incontestability provides conclusive evidence of ownership and
4  the right to use the trademark and eliminates the common-law defenses of good
5  faith and lack of knowledge. Levi Strauss & Co. v. GTFM, Inc., 196 F. Supp. 2d
6  971, 976 (N.D. Cal. 2002) (citing 15 U.S.C. § 1072).

7       If goods are named in an incontestability affidavit but have not been used
8  continuously for five consecutive years, or are not currently in use, the affidavit
9  "amounts to an attempt to acquire a right as a result of a false statement." Duffy-
10  Mott, 424 F.2d at 1100; Torres, 808 F.2d at 48 (registration cancelled because
11  registrant falsely claimed mark was currently in use); Robi, 918 F.2d at 1444
12  (registration cancelled because registrant falsely claimed there was no final
13  decision adverse to registrant's claim of ownership). False statements made in an
14  incontestability affidavit may jeopardize not only the incontestability claim, but
15  the underlying registration itself. Robi, 918 F.2d at 1444.

16       It is undisputed that Electro Source has never used the mark on any goods
17  since the assignment and was not selling any wallets, backpacks, totebags, or
18  luggage with the '287 mark when its president signed and filed the Combined
19  Declaration. See Placido Depo., pp. 53-54. Defendants concede that "[a]ny use
20  by Mallett (whether before the assignment as owner or after the assignment as
21  licensee) would have inured to the benefit of Plaintiff." Defs.' Mot., p. 13.
22  Defendants claim, however, that Mallett's last interstate commerce transaction was
23  in Texas in November 1998 and since then, Mallett's transactions have been
24  relegated to California and have been de minimis.

25       In a declaration filed with Plaintiff's opposition to the instant motion,
26  Mallett asserted that he continuously transported and/or sold wallets and luggage
27  in the nature of backpacks and totebags bearing the '287 mark in interstate
28  commerce from June 1995 through the August 5, 2002 assignment. Mallett Decl.

¶ 10.[17]  He stated that after the August 5, 2002 assignment, he continuously sold Pelican-branded goods via in-person sales visits to stores in California and Arizona.  Id. ¶ 11.  Indeed, Mallett claimed to have  sold Pelican-branded goods until he disposed of his remaining inventory by selling it to Plaintiff in or about January 2003.  Id.  According to Mallett, he always carried portions of his remaining inventory on sales calls in connection with his Koko Island shirt business in interstate commerce around the country.  Id. ¶ 13.  In particular, Mallett stated that during the period 2001 through January 2003, he made sales calls to Surf City in North Carolina and Body Glove in California, which both purchased totebags and backpacks bearing the '287 mark.  Id.  He recalled selling 100 units of assorted items to Body Glove as late as about November 20, 2002. Mallett Depo., pp. 153-54; Pl.'s Opp'n, p. 19.  He represented that such sales calls to numerous stores had been "fairly constant" throughout his period of ownership. Mallett Decl. ¶ 13.  From September 1995 through September 2002, Mallett stated that he also transported goods from his warehouse to trade shows in Florida.  Id. ¶ 14.  Mallett specifically recalled attending eight surf expos in Florida since November 1998.  Id.

Records submitted by Mallett during discovery indicate that the few sales made in 2001 were all in California.  Sales Chart, Finch Decl., Exh. X.  The last documented sale in the record occurred on September 24, 2001.  Id.  In his delcaration, Mallett explained that at the trade shows, particularly in the years 2000, 2001, and 2002, he often sold Pelican-branded products for cash and did not keep records of these transactions.  Mallett Decl. ¶ 15.[18]

---

[17] Mallett refers to the "August 2, 2002 assignment," but he appears to mean the August 5, 2002 assignment.

[18] Mallett's deposition testimony referred to cash sales:
Q: So everything you would have sold since '97 would be reflected in the deposits

1    Mallett's version of events provided Electro Source with some information
2    to support its assertion in the Combined Declaration that the mark was in
3    continuous use for five consecutive years.  Even if the use was not continuous and
4    the use of the mark was not sufficient "use in commerce," Defendants cannot
5    demonstrate that Electro Source's president *knew* the representations in his
6    declaration were false.

7    Defendants further allege that Electro Source knew it had no information to
8    support the three representations in the declaration because it failed to put any
9    inquiry to Mallett or to request sales records for the five consecutive years after
10   the date of registration.  However, Mallett claimed that shortly before he executed
11   the assignment, he met with Plaintiff's attorneys.  Mallett Decl. ¶ 19.  According
12   to Mallett, he was asked about each of the products he was selling with the Pelican
13   trademark, including approximate number of products sold, whether he took them
14   to trade shows, and the continuity of his sales and promotional activities.  Id.[19]

15

16   _____

17   on the pages through RM 0169?
        A: No.
18      Q: Why do you say that?
        A: As you notice the checkbook, in about 2001 I starting using that same
19   checkbook for other reasons besides Pelican, but I still put the Pelican things in there.
20      Q: Okay.
        A: And it doesn't – it doesn't reflect any cash sales in '90 and like 2000 and 2001
21   and even part of this year.  I started selling some of the bags for cash, which I didn't keep
22   records of because it was a cash sale on the spot.  So I just didn't keep records and didn't
     deposit the cash.
23      Q: So you don't have records of those sales at all?
24      A: The cash sales?
        Q: Yes.
25      A: No.
26   Mallett Depo., pp. 168-69 (Mallett's Decl., Exh. 7).

27      [19] Defendants' objection to this testimony on the basis of hearsay is overruled.  The
28   questions posed are not hearsay.

1   Additionally, he claims he was asked about his first use of the mark and about any
2   goods that he had previously sold under the mark but no longer sold or marketed.
3   Id.  In sum, Defendants cannot demonstrate, as a matter of law, that Plaintiff
4   Electro Source knowingly made false representations of material fact in the
5   Combined Declaration submitted to the PTO.[20]

6

7   **C.    Mallett abandoned the '287 trademark before assigning it to Plaintiff**

8          Defendants argue that the '287 Registration should be cancelled on the basis
9   of abandonment because the joint venture discontinued the mark in the ordinary
10  course of trade with the intent not to resume use in February 1998.

11         A registration may be cancelled at any time if the registered mark has been
12  abandoned.  15 U.S.C. § 1064(3).  A mark may be challenged as abandoned even
13  after it is deemed incontestable.  Shelby v. Ford Motor Co., 1993 WL 528389, *5
14  (C.D. Cal. July 28, 1993) (citing 15 U.S.C. § 1115(b)(2)); Levi Strauss, 196 F.
15  Supp. at 976.  Section 1127 of Title 15 defines "abandoned" as follows:

16         (1) When its use has been discontinued with intent not to resume such use.
17         Intent not to resume may be inferred from circumstances.  Nonuse for 3
           consecutive years shall be prima facie evidence of abandonment.  "Use" of a
18         mark means the bona fide use of such mark made in the ordinary course of
19         trade, and not made merely to reserve a right in a mark.

20  15 U.S.C. § 1127.  Accordingly, abandonment requires two elements: (1) nonuse
21  and (2) intent not to resume use.  Prudential Ins. Co. v. Gibraltar Financial Corp.
22  of Cal., 694 F.2d 1150, 1156 (9th Cir. 1982).  A prima facie case of abandonment
23  may be rebutted by showing valid reasons for nonuse or lack of intent to abandon
24

25  _____

26         [20] Of course, even in the absence of fraud, false statements in a declaration cannot
    entitle the registrant to the benefits of incontestability.  As the court finds the mark was
27  abandoned, it necessarily finds the statements of continuous use of the mark in interstate
    commerce to be false.  See discussion infra.
28

                                        22

the mark. <u>Abdul-Jabbar v. General Motors Corp.</u>, 85 F.3d 407, 411 (9th Cir.
1996). The burden of proof is on the party making the claim. <u>Abdul-Jabbar</u>, 85
F.3d at 411 & n. 4. Establishing a case for cancellation of a registration on the
grounds of abandonment requires clear and convincing evidence. <u>See Prudential</u>,
694 F.2d at 1156 ("Abandonment of a trademark, being in the nature of a
forfeiture, must be strictly proved."); <u>Emachines, Inc. v. Ready Access Memory,</u>
<u>Inc.</u>, 2001 WL 456404, * 5 (C.D. Cal. Mar. 5, 2001) ("[A]bandonment must be
shown by clear and convincing evidence.") <u>cf.</u> <u>Societe De Developments</u>, 662 F.
Supp. at 845, 848-49 (applying preponderance of the evidence standard).[21]

Although abandonment is a question of fact, objective evidence of
abandonment may outweigh a party's averments of lack of intent to abandon and
justify summary judgment. <u>See I.H.T. Corp. v. News World Communications,</u>
<u>Inc.</u>, 1984 WL 604, *8 (S.D.N.Y. July 3, 1984); <u>Rivard v. Linville</u>, 133 F.3d 1446,
1448-49 (Fed. Cir. 1998) (affirming Trademark Board's order granting summary
judgment on basis of abandonment); <u>Levi Strauss</u>, 196 F. Supp. 2d at 976
(granting plaintiff's motion for summary judgment on abandonment issue);
<u>Oshman's Sporting Goods Inc. v. Highland Import Corp.</u>, 16 U.S.P.Q.2d 1395
(T.T.A.B. 1990) (granting summary judgment on abandonment in the absence of
genuine issues of material fact or additional evidence for trial); McCarthy § 17:13.
As the statute states, an intent to discontinue use may be inferred from
circumstances in a particular case. <u>See</u> 15 U.S.C. § 1127.

In his declaration, Mallett alleged that he continuously made sales of
Pelican-branded goods through January 2003, when he disposed of his remaining
inventory. Mallett Decl. ¶ 13. He stated that at the time the Combined

---

[21] The majority of courts have interpreted the "strictly proved" rule to mean
evidence requiring clear and convincing proof. McCarthy § 17:12. The Ninth Circuit has
not spoken directly to this issue.

1   Declaration was filed in September 2002, he was transporting backpacks, wallets,

2   luggage, and totebags from his warehouse in California to a surf expo in Florida.

3   Id. ¶ 14.  Defendants argue that Mallett's use of the trademark after February 1998

4   was not bona fide, and that Mallett did not intend to resume use of the mark after

5   that date.

6        Certain facts are undisputed.  The last time Mallett ordered any Pelican-

7   branded products from Robbins was in 1996 and he did not claim to have ordered

8   any Pelican-branded goods from anyone else.  Mallett Depo., p. 27.[22]  Mallett's tax

9   returns contained no Schedule C for the Pelican business after 1997 because he

10  "wasn't doing a whole lot of business" after 1997 and the business was a "loss."

11  Id., p. 328.[23]  In February 1998, Mallett gave Robbins inventory worth

12

13  _____

14      [22] As of February 2003, Mallett had no intention of ordering any more inventory:

15      Q: Have you ordered any inventory since the last time we took your deposition
    [December 11, 2002]?

16      A: No.

17      Q: Any plans to order any inventory? By "plans" I mean have you made actual
    inquiries of suppliers since Electro Source purchased the inventory?

18      A: No.

19      Q: You haven't done anything overt – correspondence, inquiries, contacts,
    anything like that – that would make inquiry about replacing that inventory?

20      A: No.

21  Mallett Depo., pp. 244-45.

22      [23] Q: When was the last time that you recall having a tax return that included the
    Pelican business?

23      A: For absolute sure?

24      Q: Yes.

25      A: '95, '6, '7, and probably in those years for sure.  Substantial money.  The rest
    I'm not sure.

26      Q: Is there a reason that you're not sure of the later years?

27      A: I wasn't doing a whole lot of business with it.  It was a loss, and I don't know if
    I even reported it or not.

28  Id., p. 328.

24

1 │ approximately $16,000 wholesale.  Mallett Depo., pp. 185-88, 405.[24]  After that

2 │ date, Robbins and Mallett had no further business dealings with one another.[25]

3 │ The last use of Pelican letterhead in the record is December 1, 1998. Finch Decl.,

4 │ Exh. O.

5 │

_____

6 │ [24] A: I gave Tom some inventory.  He wanted to sell them.

7 │ Q: Tom is who?

8 │ A: Tom Robbins.

Q: Did he sell any?

9 │ A: I guess.  I gave him inventory, and he took it.

10 │ Q: Did he pay for it?

A: No.  I just gave an amount.  That's what it was worth.

11 │ Q: That was done in 1998?

12 │ A: Yes.

Q: Why did you give him inventory?

13 │ A: Because he's a good guy, and he wanted it.

14 │ Q: So you just handed him over $16,000 worth of inventory and shook hands and said he's [a] nice guy?

15 │ A: I mean – yeah.

16 │ Id., pp. 185-86.

17 │ . . .

Q: Did he give you anything else in exchange for this inventory at all?

18 │ A: No.

19 │ Q: I guess I'm a little puzzled as to how you expected to be compensated for this $16,000 worth of inventory.

20 │ A: It's simple.  He made the goods, and I had a lot of inventory there, and he

21 │ wanted to get some money.  So I gave him some inventory.

Id., p. 188.

22 │ . . .

23 │ A: [Robbins] came over here, and the money was a little lopsided.  He said, "I'm going to take some inventory."  I said, "Go ahead.  Whatever.  Just list it out."

24 │ Id., p. 405.

25 │ [25] Q: Would it be fair to say that after 2/2/98 that while you may have talked about

26 │ business, you never engaged in any business activities, joint ventures, joint business

27 │ transactions together with Tom Robbins?

A: That's fair to say.

28 │ Id., p. 407.

25

1   Mallett pursued a number of other employment opportunities in or after

2   1998. Mallett began selling products as a commissioned salesman for No Fear and

3   Billabong and then Koko Island, World Famous Sports, and Blue Gem. Id., pp.

4   27-33. In fact, in January 1999 Mallet signed a non-compete agreement with

5   Koko Island. Finch Decl., Exh. K, p. 4 § 5.5.[26] Mallett sold Pelican-branded

6   goods on the side in order to get rid of his inventory.[27] Mallett initially had sales

7   representatives selling his products in 1996 and 1997, but no longer used sales

8   representatives after that time. Mallett Depo., pp. 154-55.

9   Records of Mallett's sales from 1995 through 2001 show a marked decrease

10  in recorded sales of Pelican-branded goods after 1998. Sales Chart, Finch Decl.,

11  Exh. X. There were approximately 200 recorded sales in 1996, 104 sales in 1997,

12  and 52 sales in 1998. Id. In contrast, there were only approximately 23 recorded

13  sales in 1999, 11 sales in 2000, and 5 sales in 2001. There are no recorded sales

14  after September 24, 2001. Id. The last recorded sale in interstate commerce was

15  on November 17, 1998 to a company in Texas for the sale of wallets. Id., lines

16  358-59. Although intermittent sales and small inventory do not necessarily imply

17

18  [26] Although it is not clear that Mallett sold Pelican-branded goods regardless of the
    agreement's terms or that Mallett's sales necessarily violated the agreement, the fact that
19  Mallett entered into a non-compete agreement with Koko Island in January 1999 is
    relevant evidence of Mallett's intent not to resume use of the mark. See 15 U.S.C.
20  § 1127.

21

22  [27] Q: Tell me what you have done since 1997 to try to get rid of the inventory of
    goods that you have in your garage.
23      A: I just take them on the road with me and sell them to accounts that I normally
24  sell to or even new people.
        Q: Tell me how you do that.
25      A: Put them in my car and go on the road, just like an outside salesman.
26      Q: So while you're selling Koko Island shirts and sandals and hats, you pull a
    Pelican bag out of your car and say, "Would you like to buy one of these too?"
27      A: That's basically it.
28  Mallett Depo., p. 153.

1   abandonment, sporadic, casual, or transitory use of a trademark is not sufficient to

2   establish bona fide use. See Societe De Developments, 662 F. Supp. at 849; see

3   also Person's, 900 F.2d at 1571.[28]  In fact, relatively minimal sales in later years

4   may be evidence of abandonment.  See Anvil Brand, Inc. v. Consolidated Foods

5   Corp., 464 F. Supp. 474, 481 (S.D.N.Y. 1978) (finding abandonment where

6   80,000 to 120,000 dozen shirts bearing the mark sold prior to 1970, compared

7   with less than 100,000 shirts in the next five years); Oshman's, 16 U.S.P.Q.2d at

8   1397 (finding abandonment where use of trademarked item was "minimal" and

9   "inconsequential").

10        The quality of post-1997 sales is also significant.  The records indicate that

11   after 1998, Mallett began selling most of his trademarked goods at or below

12   wholesale prices.  (Compare wholesale prices in Finch Decl., Exh. B, p. RM 0195

13   and advertised wholesale prices in "Pelican Catalogs Masters," Finch Decl., Exh.

14   N, with Invoices, Finch Decl., Exh. M, pp. RM 0141-42, RM 0145-0158 and Sales

15   Chart, Finch Decl., Exh. X).[29]  Mallett also began selling goods on consignment.

16   (See Invoices, Finch Decl., Exh. M, pp. RM 0146, RM 0148, RM 0150, RM 0152,

17   RM 0157, RM 0158).  Some of the goods were even sold below cost.  Mallett

---

19   [28] Plaintiff argues that the amount of sales should be considered in the context of

20   the particular industry at hand – the garment and accessories industry.  See Chance, 242

21   F.3d at 1156-57 ("[T]he stricter standard [after Congress passed the Trademark Law

     Revision Act in 1988] contemplates instead 'commercial use of the type common to the

22   particular industry in question.'"); Paramount Pictures Corp. v. White, 31 U.S.P.Q.2d

23   1768, 1774 n. 8 (T.T.A.B. 1994) ("[T]he Committee recognizes that the 'ordinary course

     of trade' varies from industry to industry.") (citing congressional report).  Even if

24   sporadic sales are common to the industry, they stand in sharp contrast to the amount of

25   sales Mallett achieved from 1995 through 1997.

26   [29] Occasionally, Mallett listed the regular and discounted rates on the invoices

27   themselves.  (See RM 0145 ("Reg. 5.00" and "Reg. 6.00" compared with selling prices of

     $2.50 and $3.00, respectively); RM 0151 ("Reg Cost 24.50" compared with selling price

28   of $12.00)).

Depo., pp. 327, 329.[30]  Mallett stated that the reason he was selling below cost was to get rid of his inventory. Id., p. 325.[31]

Mallett's actions are consistent with his words.  In February 1998, he gave Robbins 31 boxes containing $16,000 worth of inventory in order to "get [the inventory] down." Id., p. 187.[32]  Thereafter, the only sales Mallett made of goods bearing the mark were ancillary to his ongoing business ventures and were made in order to "get rid of [his] inventory."  Mallett Depo., pp. 153, 325.  That same year, he approached Pelican Products, Inc., one of the Defendants in this case, and

---

[30] Q: You got rid of those for $7, the backpacks?  That's a pretty steep discount, isn't it?
A: Uh-huh, yes.
Q: Was that below your cost?
A: Probably.
Q: And the $2 for the wallets, was that below your cost?
A: Probably.
Mallett Depo., p. 327.
. . .
Q: Incidentally, with respect to all of these invoices that we've gone over so far . . . all of them have been at fairly steep discounts.
A: Most of them.
Q: Would those discounts have been below your cost?
A: At or below. I think that's a fairly reasonable statement.
Id., p. 329.

[31] Q: Is the reason that you were discounting the price to these companies so that you could get them to get rid of your inventory?
A: Yes.
Id., p. 325.

[32] Q: So this was 31 less boxes you had in your garage to have to worry about [after giving Robbins $16,000 in inventory]; correct?
A: Yes.
Q: At that particular point in time, were you just trying to get rid of your inventory that you had in your garage?
A: I was trying to get it down, yes.
Id., p. 187.

offered his Pelican-branded goods for promotional purposes.  He suggested that Pelican "buy a bunch of [bags containing the goods] and give them to your executives, give them away at trade shows. . ." Id., p. 257.  Mallett was not concerned about confusing the origin of the mark or possible infringement by Pelican.  Id., pp. 83-84.[33]  Mallett approached Plaintiff Electro Source with a similar offer to buy his products.  Id., pp. 256-57.  Indeed, after assigning his right and getting a license from Electro Source, he sold his remaining inventory to Electro Source.  Id., pp. 244-45; Placido Depo., pp. 24-25; Invoice to Larry Russ, Finch Decl., Exh. R.[34]  Although he could have continued selling the inventory pursuant to the license-back agreement, he chose instead to dispose of it by selling it to Plaintiff.  Id.

Plaintiff relies on Mallett's assertion that he made unrecorded cash sales, particularly between the years 2000 and 2002.  Mallett Decl. ¶ 15.  Mallett did not

---

[33] Although Mallett was not required to sue possible infringers in order to avoid a finding of abandonment, it may be considered in assessing Mallett's intent to resume use of the mark.  See 15 U.S.C. § 1127; McCarthy § 17:17.

[34] Q: Is the inventory currently located at Electro Source?
A: Yes.
Q: And that's your inventory?
A: Yes.
Q: Why was it transferred to Electro Source?
A: They purchased it.
Q: What did they pay for it?
A: The amount?
Q: Yes.
A: Little over $5,000.
Q: So in fact, you don't have any inventory anymore?
A: No.
Mallett Depo., p. 244.

1  articulate how many cash sales he completed during this period.[35]  Plaintiff has

2  submitted no evidence of these cash sales and Mallett admitted that none exists.

3  Id.  Nor has Plaintiff submitted evidence from any of the alleged buyers during

4  this three-year period.  Courts have found abandonment where there is an absence

5  of documentation showing bona fide use.  See Oshman's, 16 U.S.P.Q. at 1397;

6  Uncas Manufacturing Co. v. Clark & Coombs Co., 309 F.2d 818, 820 (1st Cir.

7  1962) .  The court is entitled, based on the lack of documentation, to presume that

8  the testimony from these alleged buyers would be negative and that the mark was

9  not in use during this period.  See McCarthy § 17:9.  The court is also entitled to

10  draw inferences from the evidence that does exist.  Id.  Regardless of whether

11  these cash sales were made, the fact that Mallett stopped recording sales altogether

12  in 2001 supports the inference that the cash sales were *de minimus* and that Mallett

13  was closing shop on the Pelican business and no longer intended to resume bona

14  fide use of the trademark.

15       Mallett testified that he did not intend to abandon the trademark.  Mallett

16  Decl. ¶ 20.  Mallett's conclusory assertion, however, is entitled to little weight and

17  is belied by the evidence, including a precipitous decline in sales and his own

18  admissions that as early as February 1998, he was attempting to dispose of his

19  remaining inventory.[36]  Mallett Depo., pp. 187, 325.  See Rivard, 133 F.3d at 1449

20  ("A registrant's proclamations of his intent to resume or commence use in United

21  States commerce during the period of nonuse are awarded little, if any, weight.");

22  McCarthy § 17:13 ("If all a party had to do to avoid a holding of abandonment

23  was to testify that he never had an intent to abandon the mark, or never had any

24

---

25      [35] Mallett stated that he "often sold Pelican brand products for cash."  Mallett Decl.

26  ¶ 15.  Mallett did not define what he meant by "often."

27      [36] There were only five recorded sales in 2001 compared to approximately 200

28  recorded sales in 1996.

1    intent not to resume use, then no mark would ever be held abandoned.")

2         The evidence demonstrates that Mallett was closing his business in 1998

3    and any sales made thereafter, including undocumented cash sales, were made for

4    the purpose of disposing of inventory with no intent to resume use of the mark.

5    "The law grants trademark rights to a party so as to protect the good will

6    associated with the business identified with the mark.  If the business itself ceases,

7    the need for the protection of the good will ceases." Anvil, 464 F. Supp. at 480;

8    see also MB Financial Bank, N.A. v. MB Real Estate Services, L.L.C., 2003 WL

9    21462501, * 10 (N.D. Ill. June 23, 2003).

10        The law is also clear that an attempt merely to rid oneself of inventory is

11   indicative of abandonment.  See Uncas Manufacturing Co. v. Clark & Coombs

12   Co., 309 F.2d 818, 820 (1st Cir. 1962) (finding abandonment where attempt to sell

13   goods may have been evidence of intent to dispose of remaining stock of an

14   already abandoned line of merchandise); Oshman's, 16 U.S.P.Q.2d at 1397

15   ("selling off remaining inventory without any intent to resume use is deemed

16   abandonment of the mark."); MB Financial Bank, 2003 WL 21462501, * 9

17   ("Residual use, such as token use, use by sale of the remaining inventory

18   containing the mark, or use merely to prevent others from using the mark, are not

19   bona fide uses under the Lanham Act."); Anvil, 464 F. Supp. at 481 (merely

20   depleting an inventory of goods is not part of "an ongoing program to exploit the

21   mark" and is insufficient to vest a party with trademark rights); Del-Rain Corp. v.

22   Pelonis USA, Ltd., 2002 WL 133754, *2 (2d Cir. 2002) (unpublished) (Despite

23   sale of 25,000 heaters, "[a]n effort to dispose of the remaining stock of an

24   abandoned line of merchandise does not constitute a 'bona fide use . . . in the

25   ordinary course of trade' that suffices to defeat a finding of abandonment.").

26        Additionally, Plaintiff has failed to demonstrate valid reasons for Mallett's

27   nonuse.  Although Mallett's illness in 1998 may have contributed to the decline in

28   sales, it does not affect the remaining compelling evidence of abandonment.  On

1   this record, no reasonable juror could find that Mallett made bona fide use of the

2   mark in the ordinary course of trade and intended to resume bona fide use of the

3   mark in interstate commerce after 1998. The court therefore finds, as a matter of

4   law, that Mallett abandoned the '287 mark.[37]

5

6   **D.   Because Mallett had abandoned the '287 mark prior to assignment,**
       **Plaintiff's assignment was an assignment in gross**

7

8       A trademark is "assignable [only] with the good will of the business in

9   which the mark is used, or with that part of the good will of the business

10  connected with the use of and symbolized by the mark." Glow Industries, Inc. v.

11  Lopez, 273 F. Supp. 2d 1095, 1107 (C.D. Cal. 2003) (citing 15 U.S.C. § 1060).

12  Assignment of a trademark along with goodwill allows the assignee to "step into

13  the shoes" of the assignor and gain any priority the assignor may have in the mark.

14  Emachines, 2001 WL 456404, *11 (citation omitted). An assignment that is not

15  accompanied by good will is "in gross" or invalid. Id. An abandoned mark that is

16  assigned constitutes an assignment in gross because "[a]n abandoned trademark is

17  not capable of assignment." Parfums Nautee Ltd. v. American Int'l Industries, 22

18  U.S.P.Q.2d 1306, 1309 (1992) (citations omitted); Abdul-Jabbar, 85 F.3d at 411

19  ("[T]he law ceases to protect the owner of an abandoned mark.") An assignee is

20  bounds by the acts or nonacts of its predecessor. Parfums, 22 U.SP.Q.2d at 1309.

21      Mallett, Plaintiff's predecessor-in-interest, abandoned the mark; therefore

22  Plaintiff's assignment was an assignment in gross. Id. Even had Plaintiff

23  ―――――――――――――

24      [37] Abandonment for purposes of common law trademark is established when "the
    party asserting rights in the designation [trademark] has ceased to use the designation

25  with an intent not to resume use." Restatement (3d) of Unfair Competition § 30(2)
    (1995); see also Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 31 (1900) ("To

26  establish the defense of abandonment it is necessary to show not only acts indicating a

27  practical abandonment, but an actual intent to abandon."). For the same reasons
    discussed above, the court finds that Mallett abandoned any common law rights to the

28  '287 mark.

32

attempted to use the mark in commerce after the assignment, its subsequent efforts could not have cured the prior abandonment. Id. at 1310. Any later efforts would have represented a new and separate use. Id.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment to cancel the trademark registration on the basis of abandonment and assignment in gross is GRANTED. Trademark Registration No. 2,073,287 is ordered CANCELLED. As the claims asserted in Plaintiff's First Amended Complaint rely solely on the '287 Registration, Defendants' motion for summary judgment as to Plaintiff's remaining claims is GRANTED. Defendants' counterclaim remains.

DATED:    April 7, 2004


Nora M. Manella
United States District Judge